SHAFFY MOEEL, ESQ.
Cal State SBN 238732
MOEEL LAW OFFICE
214 Duboce Ave.
San Francisco, CA 94103
Telephone:  (415) 735-5021
Facsimile:   (415) 255-8631
Email:          shaffymoeel@gmail.com

Attorney for Defendant
PAUL SLOANE DAVIS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PAUL SLOANE DAVIS, <br><br> Defendant. | CASE NO. CR 13-0720-CRB <br><br><br> **SENTENCING MEMORANDUM** |

I.

*It's nine o'clock on a Saturday*
*The regular crowd shuffles in*
*There's an old man sitting next to me*
*Makin' love to his tonic and gin*

*He says, "Son, can you play me a memory*
*I'm not really sure how it goes*
*But it's sad and it's sweet and I knew it complete*
*When I wore a younger man's clothes.*

--"Piano Man," Billy Joel

Paul Sloane Davis lives in a room in a house he shares with 3 other single, middle-aged men. The room is about 12 feet by 14 feet. It's carpeted, an aging beige color that could use either a complete replacement, or a minimum of 3 washes. In the room he has a slouchy twin mattress. It sits directly on the carpeted floor without a box spring or frame to hold it up. His sheets are mismatched and the bed is haphazardly made—sheets not quite fully tucked in, blankets pulled straight lopsidedly. Next to the bed is an old desk, the kind a public school teacher might have had in a 1970s classroom. On it sits an old laptop that works but only intermittently. And that's it by way of furniture for Mr. Davis—aside from 3 or 4 old boxes that contain his life's possessions—papers, a framed photo, an old flower vase--placed unceremoniously in the corner. The house is a typical 3-bedroom family home—subdivided into private and common areas by 4 men who have, for their own reasons, ended up alone and unable to afford a home on their own meager incomes.

Although he lives with 3 other people, Mr. Davis rarely sees his housemates. In fact, days will go by before Mr. Davis has any interaction with anyone at all. He might exchange pleasantries with the clerk at the grocery store when he goes to buy a handful of fruit or cans of chili. If he's managed to make an appointment with a doctor--rare because of the limitations of his Medicare--he'll speak to the staff there. But that's about it. Mostly, he speaks to me, his lawyer, and occasionally, to

his pre-trial services officer. And when his case is over, even those interactions will cease permanence. And he will be totally alone.

At 76 years old, Mr. Davis is far from the picture of optimal health. Aside from having lost nearly all of the hearing in his left ear, his ongoing problems with glaucoma, and his propensity to get kidney stones, he has severe dental deterioration that, if remain untreated, will likely lead to serious infection. Because he does not have any dental health coverage, Mr. Davis has little prospects for having these issues treated. His most recent trip to an oral surgeon for an evaluation of necessary treatment resulted in a quote for treatment of approximately $10,000. If incarcerated, this may be a cost imposed on the taxpayer, if Mr. Davis is even lucky enough to receive treatment.

In May of this year, the Office of the Inspector General (OIG) of the U.S. Department of Justice released a report entitled, "The Impact of an Aging Inmate Population of the Federal Bureau of Prisons." *See* Attached Exhibit A. In sum, the OIG fond that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. Aging inmates on average cost 8 percent more per inmate to incarcerate than inmates 49 years and younger, $22,676 as compared to $24,538. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care than institutions with the lowest percentage of aging inmates. The difference is also marked when comparing the cost of medications for a younger versus elderly group, where the BOP spent, on average, 14 times more per inmate on medication.

But the OIG found that the increased costs of medical care was just one problem with the increase in incarcerating older inmates. The OIG found that BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose. This becomes problematic because aging inmates need help with daily activities such as movement, dressing, bathing, and eating. Staff are simply not trained or available to take on this

monumental task. Not only that, but aging inmates often have complicated medical care needs that require them to seek attention off-site. But the OIG found that the BOP institutions lack correctional officers to staff these trips, leading to delayed access to medical care for older inmates that can either lead to more serious medical problems or sometimes, even death.

The OIG also found that the physical infrastructure of BOP institutions cannot adequately house aging inmates. For example, an individual like Mr. Davis, with weak and unhealthy knees that give him trouble walking or climbing stairs, will need the lower bunk or, perhaps in the not so distant future, a handicapped-accessible cell. But overcrowding in the BOP has limited these types of living spaces. Compounding this problem of access and availability is that the BOP has not conducted a nationwide review of the accessibility of its institutions since 1996.

The OIG reported other issues and concerns regarding the increase in incarcerating aging inmates: that the BOP does not provide programming opportunities specifically addressing the needs of aging inmates and that although aging inmates could be viable candidates for early release, strict BOP policy limits those who can be considered and, as a result, few have been released.

This study was conducted to address a growing concern of an exponential increase in the aging inmate population. From 2009 to 2013 alone, the number of inmates age 50 and older in the BOP increased by 25 percent, from 24,857 to 30,962. This is astounding given that, during the same period, the population of inmates age 49 and younger decreased approximately 1 percent, including an even larger decrease of 29 percent in the youngest inmates age 29 and younger.

What is truly striking is that there has been an increase in an aging inmate population despite data that shows *remarkably low recidivism* rates among this population. Specifically, a sampling conducted by the OIG found that 15 percent of aging inmates were re-arrested for a new crime within 3 years of release, compare this with a general 41 percent recidivism rate for non-aging inmates.

Even among that 15 percent who did recidivate already had a documented history of recidivism, which Mr. Davis does not.

The OIG is only one agency among a growing group of governmental departments, organizations, and legislators expressing concern regarding incarcerating aging inmates. *See* Attachment B: At America's Expense, The Mass Incarceration of the Elderly, ACLU Report. Judges, too, have added their voices to the debate. Judge Posner, for example, regularly questions the utility of prison sentences for the elderly.

> There is much that federal sentencing judges are required to consider in deciding on a sentence to impose—maybe too much: the guidelines, the statutory sentencing factors, the statutory and regulatory provisions relating to conditions of supervised release, presentence reports, briefs and arguments of counsel, statements by defendants and others at sentencing hearings. But in thinking about the optimal sentence in relation to the problem of the elderly prisoner, probably the judge's primary focus should be on the traditional triad of sentencing considerations: incapacitation, which prevents the defendant from committing crimes (at least crimes against persons other than prison personnel and other prisoners) until he is released, general deterrence (the effect of the sentence in deterring other persons from committing crimes), and specific deterrence (its effect in deterring the defendant from committing crimes after he's released). A sentence long enough to keep the defendant in prison until he enters the age range at which the type of criminal activity in which he has engaged is rare should achieve the aims of incapacitation and specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the defendant is being sentenced have a high discount rate; for beyond a point reached by a not very long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers.
>
> There will be cases in which the heinousness of the defendant's crime or other factors argue compellingly for a sentence longer that needed to achieve the goals served by incapacitation and general and specific deterrence. But in run of the mine cases consideration of those goals is likely to argue for a relatively lenient sentence.

*United States v. Presley*, 2015 U.S. App. LEXIS 9778, *9-11, 790 F.3d 699 (7th Cir. Ill. 2015) (Posner, J. concurring).

Mr. Davis presents an extremely low, if any, risk of recidivism. His case has lasted nearly two years and he has not had any problems while on pre-trial release. Also, while on pre-trial release, his contact with his co-defendant, Diane Cobb, his long-time friend, has been limited. It is undisputed that Mr. Davis did not have any domain in this case over anything transactional. He was

not even listed as an account holder on the DM Financial account.  Mr. Davis never signed any of the checks either to or from investors and never arranged for any wire transfers.  Among the numerous emails produced in discovery, Mr. Davis is listed in only a handful of them.  In an instant message conversation between Tony Cobb (Ms. Cobb's step-son) and Diane Cobb, Tony asks Ms. Cobb, "Is Sloane doing anything?" Ms. Cobb replies, "Yeah, bitching because he doesn't have any money but he doesn't bring anything in so he can't get paid. I've been paying him $1500/month."  Discovery, Bates page 842.  Before meeting Ms. Cobb, Mr. Davis had a long history of legitimate self-employment, with which he supported himself and his family.  Other than a misdemeanor DUI from 16 years ago, Mr. Davis has never been in trouble with the law.  Ms. Cobb is 20 years younger than Mr. Davis and was his only close friend.  Her influence over him was substantial.  As this case concludes and without the power of that influence hanging over him, Mr. Davis will continue to abide by all the conditions of his release and get through the rest of his life, day by day.

## II.

## LEGAL OBJECTIONS

### A.  Objection to 2-Level Enhancement for Number of Victims Exceeding Ten

The Pre-Sentence report enhances Mr. Davis's base offense level pursuant to U.S.S.G. § 2B1.1(b)(2(A)(i) based on an assertion that the offense had 10 or more victims.  Mr. Davis pled guilty to counts 1 through 14 of his indictment.  In those counts, there are a total of 8 victims who are identified as follows: "ST, SB, JP, RA, AC, PN, ES, and LL."   Because Mr. Davis did not plead to counts involving any other victims, and because the government bears the burden of proving, by a preponderance of evidence, that there were 10 or more victims, and has not, Mr. Davis should not receive this adjustment.  Mr. Davis does not concede the accuracy of the "Offense Conduct" section

of the PSR.  He concedes only to the facts that he admitted at the time of his guilty plea to counts 1 through 14 of the indictment.

### B.  Objection to 2-Level Enhancement for Vulnerable Victim

The Pre-Sentence report enhances Mr. Davis's base offense level pursuant to U.S.S.G. § 3A1.1(b)(1) based on an assertion that one of the victims "C.C." was a vulnerable victim.  None of the 14 counts that Mr. Davis pled guilty to in his indictment involved victim "C.C."  He does not concede the accuracy of the "Offense Conduct" section of the Pre-Sentence Report which alleges any conduct involving victim "C.C."  As argued above, for this enhancement to apply to Mr. Davis, the government bears the burden of presenting evidence, in Court, with an opportunity to cross-examine any potential witnesses, of the facts that substantiate this allegation.  Because Mr. Davis did not plead guilty to this conduct, and no evidence has been presented to the Court by the government, this enhancement should not apply.

## III.
## REQUESTED SENTENCE

### A.  Advisory Guideline Analysis

U.S.S.G. § 2B1.1(a)(1) [Base Offense Level] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S.S.G. § 2B1.1(b)(1)(G) [Loss] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ 16

U.S.S.G. § 3E1.1(a) [Acceptance of Responsibility] . . . . . . . . . . . . . . . . . . . . . . . . . . . – 2

Adjusted Offense Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Resulting Advisory Guideline Range at CHC I . . . . . . . . . . . . . . . . . . . . . . . 37-46 months

### B.  Requested Sentence Based on 18 U.S.C. § 3553(a) variance

Mr. Davis requests a sentence of twelve (12) months home-confinement to be followed by a three (3) year term of supervised release.  This sentence is sufficient but not greater than necessary to achieve the objectives of 18 U.S.C. § 3553.

Dated:  August 12, 2015                                    Respectfully submitted,


                                                                                 By: /s/ *Shaffy Moeel*
                                                                                 _____
                                                                                 SHAFFY MOEEL
                                                                                 Attorneys for Mr. Paul Sloane Davis